## Mary Loucks v. Robert N. Paden, Adm'r, et al.

1.  WITNESSES—*Incompetency of, When Removed.*—Where a person defends as the administrator of a deceased person, the adverse party is not a competent witness, but becomes competent where any person having a direct interest in the event of such action testifies therein on behalf of such party so defending to conversations and transactions occurring between such adverse party and the deceased.

2.  PARTNERSHIP—*The Fact, How Established.*—The existence of a partnership may be established by circumstantial evidence.

Bill in Chancery.—Settlement of partnership matters.. Appeal from the Circuit Court of Montgomery County; the Hon. JACOB FOUKE, Judge, presiding. Heard in this court at the May term, 1895. Reversed and remanded with directions. Opinion filed January 11, 1896.

### STATEMENT OF THE CASE.

This was a bill in chancery filed by appellant, in which she alleged that she and one Margaret A. Tinnin, from about the year 1886 to January, 1892, were partners, engaged in selling notions and small articles in the city of St. Louis, Mo.; that they were both deaf mutes; that they accumulated a partnership fund which they kept in money, at their room at 300 South Broadway, St. Louis, in a trunk belonging to said Margaret A. Tinnin, because her trunk was stronger and more secure in its fastenings than the trunk of appellant, that the money in said trunk was the joint earnings of appellant and said Tinnin.

That in February, 1892, said Margaret A. Tinnin, who had for two years previous been in poor health, was taken seriously ill and was removed by her friends to Litchfield, Illinois; that appellant also went to Litchfield to assist in the care of said Tinnin; that the said trunk of Margaret A. Tinnin containing the partnership moneys therein was taken to Litchfield, and that said joint earnings and partnership money amounted to $1,400, being the accumulations of six years partnership business; that appellant and said Tinnin frequently conversed about said money in the sign language;

that the money was to be equally divided; that appellant would have to receive $700.

That said Margaret A. Tinnin died intestate March 7, 1892, leaving certain heirs named in the bill; that Robert N. Paden was, on March 9, 1892, appointed administrator of her estate by the County Court of Montgomery County, Illinois; that he took possession of said trunk including the said $1,400; that appellant applied to said administrator for her one-half of said money, but he refused to give it to her claiming that the money was the exclusive property of said Tinnin, and will distribute same to the legal heirs of said Tinnin.

Prayer of bill is to have said money decreed to be partnership property, and said administrator be ordered to deliver one-half thereof to the complainant. The defendants answered denying the alleged partnership and claiming all the money belonged to Margaret Tinnin. The cause was referred to the master, to take and report the proof, and was submitted to the court upon the testimony taken before and reported by the master, and upon the deposition of witnesses taken in St. Louis.

The court found the complainants had not supported her case by the proof, and dismissed the bill, from which decision she appealed to this court.

W. A. HOWETT and AMOS MILLER, attorneys for appellant.

R. McWILLIAMS and JAMES M. TRUITT, attorneys for appellees.

OPINION PER CURIAM.

Only questions of facts arise herein.

They are stated by counsel for appellee to be—

First. Were the complainant and said Maggie Tinnin partners?

Second. If they were partners is the money in dispute partnership funds?

It must be determined whether the testimony of the ap-

pellant can be considered. She was in the first instance not competent to testify to facts which occurred during the lifetime of Mrs. Tinnin.

Her testimony touching fully upon her business dealings and connections with the deceased was taken by the master and much of it under the rule was incompetent, but afterward appellee introduced several witnesses, heirs of the decedent, and as such interested in the suit, who testified to conversations and transactions which, as they alleged, occurred between appellant and the deceased. The statute permitted appellant to testify as to such transactions or conversations, and thus much of her testimony which otherwise should have been rejected from consideration became competent. Even if all her testimony be excluded we think the existence of a copartnership abundantly proven.

Patrick Coughlin testified substantially as follows :

" I am forty-five years old; live at 1248 Carr street, St. Louis; got acquainted with Maggie Tinnin and Mary Loucks about eleven years ago at 1236 N. Broadway, wholesale supply house; they came to my house to buy laces, with a note from the house of Rice, Stix & Co., telling me what they wanted; they both came together; Maggie's health was delicate from the first day I saw her; they were both deaf mutes. I communicated with them in writing; Mary Loucks would buy the goods and Maggie would pay the bill; Maggie would sit in the coolest place we could get, and the goods would be brought to her and she and Mary would examine them and when satisfied they would go into the pile of things they wanted to buy. Maggie told me they were partners. Many a day Maggie would come to the house alone to buy goods, and when I asked her where her partner was, she would tell me in such and such place; then she used to come and buy goods and would ship them to Mary in different parts of Missouri, and she would remain here. I would get letters from them ordering so much goods, and the goods were always shipped to Mary Loucks.

" The letters were always written and signed by Mary Loucks; the returns were sent by Mary Loucks. All that

Maggie Tinnin told me was they were partners. About eight years ago the express drove to the door with a trunk with Mary Loucks' name on it; after awhile Maggie and Mary came in; they said they were going to buy a nice bill of goods; they went off together, and when they came back Maggie was fainty; Maggie told me that she had lost $800 and could not buy any goods; I told Maggie "you can have all the goods you want." They bought $50 or $60 worth of goods. I asked both in writing who I should charge them to and they both said charge the goods to both of them; they sent me the money from some place in Illinois; this was eight years ago; they continued to buy goods of me until about three years ago; they would buy $35 and $40 worth of laces every week. Every time Maggie came in I would say "Where is your partner?" she would write down where she was then. It was Maggie who told me she lost the $800. It was out in the paper for a week and a reward offered; she said she carried it in her bosom. When I asked who the goods should be charged to, Maggie said they were equal partners. Maggie was the general manager in buying and Mary in selling."

Andrew Eichoff, who was in the employ of the Standard Hosiery Mills in St. Louis, in 1884, and until and including the year 1889, testified the appellant and the deceased bought articles such as hosiery, linen, towels, notions, etc., from the establishment with which he was connected almost every week during the five years he was there.

They came to the store together; Miss Loucks did the buying; Mrs. Tinnin "looked on;" Miss Loucks made the payments and on some occasions the goods were sent to No. 300 Broadway where the women had a room rented in which they lived together.

They leased the room of Mrs. Frederick Woydt. She testified that the " deaf mute women " were engaged in selling stamping goods, hosiery, etc, and that she was frequently in their room and learned the sign language; that Maggie Tinnin (appellee's intestate) was often ill and always in delicate health and was confined to the room nearly all the time, but that Mary Loucks went out to sell goods every day

Loucks v. Paden.

" rain or shine; " that the witness was frequently in the room
when Mary Loucks returned in the evening, and saw Mary
give Maggie the pocket book and the money she had taken
in, and that Maggie told her they were partners.   There
was no proof of an express agreement between the women
to form a partnership, but the existence of that relation may
be established by circumstantial evidence.

Here all the facts necessary to create it are fully proven.
It may be the proof does not fully disclose the proportion
in which the members of the firm were to share in the gains
or be liable for losses, though it was proven Mrs. Tinnin
said they were " equal partners."

In the absence of any proof upon the point the presump-
tion is they were to share equally in profits and bear the
losses in the same proportion.   Nothing appeared in the
proof tending to show appellee's intestate had just right to
be allowed more than one-half the gains and profits.   Upon
the contrary, the whole current of the proof is the appel-
lant rendered the greater service to the business of the firm
and was the active, capable and trusted manager thereof.

The health of Mrs. Tinnin was so delicate she was almost
entirely incapacitated from actively engaging in making
sales of the goods in which they dealt, and for this reason
the appellant practically did all the work connected with
the business and in addition attended upon and cared for
her afflicted companion and partner.   Both were deprived
of speech and the sense of hearing, and this no doubt
brought them together and made them partners and friends
and induced the appellant to assume additional burdens in
each capacity.

We find little, if anything, in the proof produced in
behalf of the appellee tending to contradict that a partner-
ship existed between them; indeed, the evidence in that
behalf is chiefly directed to the other question—whether
the money found in the trunk was the property of the
firm ?

The position of appellee upon this question is, the money
received from the sale of goods was divided at the close of

each day, or from time to time, and the money found in the trunk was the individual property of the owner of the trunk.

There was proof tending to show the partners divided sums received from daily sale, and perhaps tending to show each had separate parcels of money; but the evidence was conclusive that all the money, whether belonging to them jointly or to each separately, was kept in the same trunk.

Each had a trunk, but it was their custom to keep all the money in Mrs. Tinnin's trunk, as they did many of the articles on hand for sale.

Mrs. Woydt, whose room they rented, testified she was often in their room when the appellant came in from "peddling," and that the appellant "always gave the pocketbook to Mrs. Tinnin, who would count the money and put it in her trunk, and that they kept their clothes in the appellant's trunk and the money in Mrs. Tinnin's trunk."

Testimony produced on behalf of the appellee is confirmatory of the alleged custom of keeping the money in this particular trunk.

Jennie Paden, a sister of Maggie, who was in St. Louis at different times and visited her and appellant in the room which they occupied, though she testified "they each had their own set of business, were room mates and shared expenses, each took care of their own money," and "kept their money separately," except "they kept some in a vase on the dresser with which to pay expenses," was compelled to state, and did state, that "Mary Loucks, when I was with them in St. Louis, counted her money every evening, and *undoubtedly* did put it in Mrs. Tinnin's trunk."

James Paden, a brother of Maggie Tinnin, gave testimony to the effect he was in St. Louis, and one evening, when Mary Loucks came in from her work, saw them divide some silver change, which he understood was the sales of the day; that Maggie put the change she got in her trunk and Mary put some change in the bureau drawer.

The appellant testified the money of both was kept in Maggie's trunk because it was stronger than her trunk.

This testimony we regard as competent for the reason before stated.

Mrs. Starr, a cousin of Mrs. Maggie Tinnin, testified that Maggie came to her house from St. Louis and remained there until she died; that both the trunks were there and that Mary Loucks had the keys to both trunks all the time and that Maggie left the keys with Mary when she left St. Louis.

It further appeared from the testimony of Patrick Coughlin, that the money of the firm was, at times at least, in the possession of Maggie Tinnin and in one package. He testified Maggie and the appellant came to his place of business and said they were going to buy a nice bill of goods; that they went off together and soon after returned, and Maggie told him she had lost $800, which she had in her bosom, and therefore they could not buy the goods; that he offered to sell them the goods on credit, and did so, etc., and charged the goods to both of them by the written direction of both.

The appellant after the death of Mrs. Tinnin produced the keys to the trunks and at the request of the administrator opened both trunks.

Money in bank bills to the amount of $1,550 was found in Mrs. Tinnin's trunk, and also in the same trunk were found hose, corsets, stamping goods, patterns, and notions confessedly of the stock in trade of the firm.

Upon the statement of the administrator that she should lose none of her rights thereby, and he would see she got whatever interest she was entitled to, the appellant allowed him to take the money. The conclusion sought to be drawn from the appearance of the bank bills and the fact they adhered together—that they had been in the package for a much longer period of time than as stated by the appellant, was, as we think, entirely overcome by the testimony of the cashier of the bank, whose experience in handling money and keeping it in packages peculiarly qualified him to throw light upon the subject.

Counsel for appellee urge the appellant made many contradictory statements as to the amount she was entitled to

have out of the money in the trunk, and attach much importance to such contradictions as tending strongly to show she had no real interest whatever in the money. These contradictions are, as we think, apparent only, at least are explainable upon theories entirely consistent with the honesty and justice of her claim to one-half of the money as partner of the deceased.

Her claim to all the money was based, in part, upon the alleged expressed intention of Mrs. Tinnin that she should have all of it in case of her (Mrs. Tinnin's) death, and in part because she insisted she had earned Mrs. Tinnin's half of the money by working for her and attending upon and caring for her when she was sick.

These supposed contradictions are based largely upon questions asked and answered in a conversation carried on by means of signs between appellant and Miss Jennie Paden. As to this conversation Miss Paden testified, "some of the questions were asked a number of times before the appellant could understand their meaning;" that she (the witness) "thought she interpreted the answers correctly, but there might have been misunderstandings;" she understood "the appellant claimed all the money because Mrs. Tinnin wanted her to have it all; also claimed it as a partner; claimed all as a gift; then all because she had earned Mrs. Tinnin's half by working for and boarding her," etc., etc.

The appellant testified Mrs. Tinnin wanted her to have all the money except $100, which was to be given to Miss Jennie Paden.

In stating her supposed interest in the money under these various claims of right therein the appellant, of course, claimed different amounts, but we find nothing in any of her claims inconsistent with the justice of her demand for one-half the money in her right as partner.

The case was presented to the learned chancellor who presided in the Circuit Court upon depositions and written testimony—we have before us the same testimony, and our facilities for determining as to the credibility of the witnesses and as to their truthfulness are not less or inferior to

those enjoyed by the trial judge. After a thorough investigation and careful consideration thereof we are constrained to declare the preponderance thereof manifestly supported the position that the money in question was the property of the appellant and the deceased in equal parts.

For this reason the decree is reversed and the cause remanded with directions to the Circuit Court to enter an order and decree requiring the administrator to deliver to the appellant one-half of the money found in the trunk of deceased, viz., the sum of $775, and to pay the costs in due course of administration.

Reversed and remanded with directions.